UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTIN DOHERTY, <br><br> Plaintiffs, <br><br> v. <br><br> TURNER BROADCASTING SYSTEM, INC., <br><br> Defendant. | Case No. 1:20-cv-00134 (TNM) |

**MEMORANDUM OPINION**

Proceeding *pro se*, Martin Doherty sued Turner Broadcasting System, his former employer, for filing fraudulent W-2s on his behalf and violating multiple D.C. laws. The Court previously dismissed Doherty's D.C.-law claims. For his claim of fraudulent W-2s, Doherty relies on a federal statute that penalizes willful filing of fraudulent tax forms. Because the evidence shows no genuine dispute about the fraudulence of the W-2s or Turner's willfulness, the Court will grant Turner's motion for summary judgment and deny Doherty's. The Court will also deny a motion to strike filed by Doherty after summary-judgment briefing.

I.

As Americans are reminded this time of year, the Government collects an income tax on a specified portion of a taxpayer's "taxable income." *See* 26 U.S.C. § 1. The Internal Revenue Code defines taxable income as "gross income minus" various deductions allowed by the Code. *Id.* § 63(a). Gross income is a catch-all, representing a taxpayer's income "from whatever source derived." *Id.* § 61(a). But the Code carves out from gross income "amounts received under workmen's compensation acts as compensation for personal injuries or sickness." *Id.*

§ 104(a)(1). In short, an employee who receives worker's compensation payments will pay no tax on those received amounts.

For fraudulent returns, the Code includes a private right of action. Specifically, 26 U.S.C. § 7434 allows a person to sue anyone who "willfully files a fraudulent information return with respect to payments purported to be made to" that person. 26 U.S.C. § 7434.

Now to the facts here. Doherty worked at Turner as a photojournalist from 2013 to 2019. *See* First Decl. of Lauren George ¶ 5, ECF No. 48-3 (First George Decl.). In 2012, he suffered a neck injury. *See* Depo. of Martin Doherty at 14, ECF No. 58-2 (Depo.).[1] That injury caused him to miss work during 2014 and 2015. *See* Def.'s Stmt of Material Facts ¶ 3, ECF No. 48-5. In late 2015, Doherty suffered another injury which caused him to miss work for periods of 2016. *See* Depo. at 24. During both absences, Doherty received compensation from Turner. *See id.* at 16–18, 24.

How Turner paid that compensation matters to this case. Under company policy, injured employees who missed more than seven straight days of work received money for that missed time under a Short-Term Disability (STD) program. *See* Def.'s Mot. for Summ. J., Ex. B-1 at 12, ECF No. 48-3. For the first ten weeks of absence, Turner would pay 100% of the employee's usual earnings. *See id.* at 13. During weeks 11 through 16, the company paid 80%. *See id.* And for weeks 17 to 26, the company paid 60%. *See id.* Beyond 26 weeks, the employee would receive benefits through either the company's Long Term Disability program or so-called "Worker's Compensation" program. *See* First George Decl. ¶ 10.

---

[1] All page numbers refer to the page numbers generated by the Court's CM/ECF filing system. All exhibit designations refer to those exhibits as denoted by the parties in their filings.

A note about the latter program: According to the record, it worked the same way as the STD program. Turner would pay a qualified employee for up to 26 weeks at the same percentages as in the STD program. *See* Pl.'s Cross-Mot. for Summ. J., Ex. 2 at 4, ECF No. 52-2. And because the employee remains on the company's payroll during that time, any non-salary benefits continue as before. *See id.* After 26 weeks, however, Turner no longer makes the payments. Instead, a third-party insurer calculates the amount due "according to the state's Worker's Compensation laws" and then pays the employee that amount. *Id.*

During his absences in 2014, 2015, and 2016, Doherty received compensation through the STD program. *See* Depo. at 15–16, 18, 24. But for the latter half of 2016, Doherty received payments through the "Worker's Compensation" program. *See* First George Decl. ¶ 17, Pl.'s Cross-Mot. for Summ. J. at 8 n.16, ECF No. 52-1 (Pl.'s MSJ). For the years 2014, 2015, and 2016, Turner issued W-2s to Doherty and reported those documents to the IRS. *See* First George Decl. ¶ 11. Doherty admits that his 2016 W-2 did not include payments made under the "Worker's Compensation" program. *See* Pl.'s MSJ at 8 n.16.

Beginning in 2016, Doherty told Turner that his W-2s were incorrect. He asserted that the STD payments he received in 2015 were actually worker's compensation and thus under 26 U.S.C. § 104 should not be subject to taxation. *See* Pl.'s MSJ, Ex. 16, ECF No. 52-3 at 13. He made the same assertions about his 2014, *see id.* Ex. 18 at 18, and his 2016 STD payments, *see id.* Ex. 17 at 15. In the meantime, he filed a substitute 2015 W-2 with the IRS, believing that his STD payments were not taxable. *See* Pl.'s MSJ at 6. After Turner affirmed that the W-2 was correct, the IRS adjusted Doherty's 2015 gross income, filed a tax lien against him, and imposed a penalty of just over $22,000. *See id.*; *see also id.*, Exs. 9 and 10, ECF No. 52-2 at 24–27.

Doherty sued Turner, alleging violations of 26 U.S.C. § 7434 (Count I), the D.C. Human Rights Act (Count II), and the D.C. Workers' Compensation Act (Counts II and III). *See* Second Am. Compl., ECF No. 24. The Court dismissed Counts II and III, leaving only Count I. *See* Mem. Opn. & Order, ECF No. 35. After discovery, both parties moved for summary judgment. *See* Def.'s Mot. for Summ. J., ECF No. 48-1 (Def.'s MSJ); Pl.'s MSJ. Those motions are now ripe.[2]

## II.

To succeed on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A factual dispute is material if it could alter the outcome of the suit, and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The "party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of" the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

Once this showing is made, the nonmoving party must provide "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (cleaned up). In ruling on a summary judgment motion, the Court draws "all justifiable inferences" from the facts in the record in favor of the nonmoving party. *Id.* at 255. But the nonmoving party must show that "a rational trier of fact" could find in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[2] The Court has jurisdiction under 28 U.S.C. § 1331.

Doherty proceeds *pro se*, so the Court generally subjects his pleadings to "less stringent standards than formal pleadings drafted by lawyers." *Gray v. Poole*, 275 F.3d 1113, 1115 (D.C. Cir. 2002) (cleaned up). "Any leeway does not extend," however, "to the *evidence* required at summary judgment[.]" *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 20 (D.D.C. 2021) (emphasis in original). Courts hold *pro se* plaintiffs like Doherty to the same evidentiary burdens as represented plaintiffs. *See Prunte v. Univ'l Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011).

### III.

The evidence does not create a genuine dispute that Turner "willfully filed" W-2s that were "fraudulent." 26 U.S.C. § 7434.

### A.

Start with the purported fraudulence of the W-2s. Doherty admits that they reflected the correct amount of money he received from Turner during 2014–2016.[3] *See* Pl.'s MSJ at 10; Depo. at 54, 55, and 57. So the returns were not fraudulent in that they misstated what he received.

Instead, Doherty suggests a different theory of fraudulence. He argues that his STD payments were for worker's compensation and thus, under 26 U.S.C. § 104(a)(1), they never should have comprised part of his gross income. By this logic, the W-2s were fraudulent because they improperly included worker's compensation payments as gross income. *See* Pl.'s MSJ at 10.

---

[3] Doherty says that Turner committed the same alleged fraud in 2008 and 2009 but acknowledges that those returns fall outside the six-year statute of limitations in 26 U.S.C. § 7434(c). *See* Pl.'s MSJ at 4, n.6.

The Court disagrees because multiple aspects of Turner's STD program operated differently from a program under the District's "workmen's compensation act[ ]." 26 U.S.C. § 104(a)(1). First, the District's Worker's Compensation Act (WCA) requires an employer to pay "66 2/3% of the employee's average weekly wages." D.C. Code § 32-1508(2). Turner's STD program—which paid Doherty during the relevant period, *see* Depo. at 15–16, 18, 24—paid more than 66 2/3% of Doherty's usual earnings for much of the time he received payments.

To be sure, weeks 17–26 of STD paid 60 percent, below the WCA-required 66 2/3 %. But that disparity is another distinction between a WCA program and Turner's STD program. More, the WCA includes a process for computation of an average weekly wage. *See* D.C. Code § 32-1511. Doherty admits that he "never got an average weekly wage determination from" Turner. Depo. at 23; *see also* Pl.'s MSJ at 9. So by Doherty's own admission, the STD program did not include steps required by the WCA.

Based on those three differences, no reasonable jury could conclude that Doherty received payments "under [the District's] workmen's compensation act[ ]."[4] 26 U.S.C. § 104(a)(1).

Doherty responds that no matter *how* Turner paid him, it *should have* paid him according to the WCA. He argues that the WCA is "the exclusive vehicle for obtaining compensation" for workplace injuries. Pl.'s MSJ at 12. This response fails for two reasons.

---

[4] Buttressing this conclusion is evidence that Turner properly followed 26 U.S.C. § 104 when paying Doherty under the company's "Worker's Compensation" program. Doherty admits that Turner did not report those payments on his W-2. *See* Pl.'s MSJ at 8, n.16. And an email from Turner's risk manager to Doherty noted that STD would pay him "in lieu of WC"—meaning worker's compensation—"[ ] until WC has to pay income benefits (after 26 weeks)." Pl.'s MSJ, Ex. 15, ECF 52-3 at 11. So Turner knew the distinction between STD and "Worker's Compensation" and paid Doherty according to the terms and tax consequences of each.

*First*, fraud requires a "false representation." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013); *see* Pl.'s MSJ at 2 (same). The Court has already found that Turner did not pay Doherty under a worker's compensation program. Thus, no matter how Doherty says he should have been paid, Turner's representations on the W-2s were not false.

*Second*, Doherty is wrong about the exclusivity of the WCA. Indeed, the WCA allows reimbursement for "advance payments of compensation" made before an award of worker's compensation. D.C. Code § 32-1515(j). So the WCA contemplates that employers may use multiple methods to compensate workplace injuries. STD payments can constitute those advance payments. *See Felder v. D.C. Dep't of Emp't Servs.*, 97 A.3d 86, 90 (D.C. 2014). Thus, employers can rely on STD payments to compensate workplace injuries.[5]

In sum, no reasonable jury could conclude that the W-2s were fraudulent.

**B.**

Even if the evidence created a genuine dispute about fraudulence—which it does not—no dispute arises over Turner's willfulness. *See* 26 U.S.C. § 7434. In the tax context, willfulness requires "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991); *see also Crespo v. Midland Credit Mgmt., Inc.*, 689 F. App'x 944, 946

---

[5] D.C. Code § 32-1504(b) also does not make the WCA the only way to pay an injured employee. That provision says that compensation under the WCA is an employee's "exclusive remedy against the employer" for injuries covered by the statute. Doherty reads that phrase to mandate the WCA's exclusivity. Not so. Rather, the phrase means that an employee may not sue an employer for workplace injuries except to obtain benefits spelled out in the WCA. *See Lockhart v. Coast. Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 116–17 (D.D.C. 2012). The WCA is exclusive as to employees' remedies, not employers' payments. Nothing in § 32-1504(b) requires employers to rely only on WCA benefits to compensate for workplace injuries. The provision, once properly understood, has no relevance here—Doherty sues to recover the taxes he paid, not his compensation for a workplace injury. *See* Compl. at 11–12.

(11th Cir. 2017) (requiring proof of "intentional wrongdoing" under § 7434 (cleaned up)). Recall Doherty's fraudulence-by-noncompliance theory. Then consider the willfulness standard, which clarifies what Doherty must prove: For Turner's conduct to be willful under his theory, Turner must have filed the W-2s with knowledge that the STD program violated the WCA.

No evidence creates a dispute about that knowledge. True, Doherty speculates that Turner had various motives—such as lower premiums, lower deductibles, and a tax deduction—to use STD instead of a WCA-compliant program.[6] *See* Pl.'s MSJ at 14–16. But despite months of discovery and the opportunity to depose witnesses, he provides no evidence to suggest that Turner knew that the STD program violated the law. In fact, Doherty can identify no Turner employee who told him that the company "knew that the [STD] policy did not comply with the [WCA][.]" *See* Depo. at 39. Without antecedent knowledge of a "violation," Turner could not have willfully filed W-2s that were fraudulent because of that violation. *Cheek*, 498 U.S. at 201.

Doherty's best evidence is an email from 2013 where an HR staffer told him that, although he would receive regular pay while injured, Turner would "code[ ]" it "as WC pay." Pl.'s MSJ Ex. 21, ECF 52-4 at 2. But Turner sent the email in 2013, well before the W-2s at issue. And the rest of it merely reiterates Turner's policy: Doherty's "normal deductions [would] be taken out of [his] check." *Id.* Turner thus told Doherty that STD would not operate like a worker's compensation payment, which is, as Doherty admits, not taxable at all.[7] Not once does the email suggest that Turner knew its STD policy violated any law.

---

[6] Doherty is apparently correct that Turner received a tax deduction. *See* Pl.'s MSJ, Ex. 24, ECF No. 52-4 at 9.

[7] Again, the evidence shows that Turner knew about this distinction because it never included on the 2016 W-2 payments that Doherty received through the "Worker's Compensation" program.

Without more, a reasonable jury could not conclude that Turner "willfully filed" fraudulent W-2s.

\* \* \*

Because the evidence shows no genuine dispute about Turner's willfulness or the fraudulence of the W-2s, the Court will grant Turner's motion for summary judgment.

## IV.

After summary-judgment briefing, Doherty moved under Federal Rule of Civil Procedure 37(c) to strike two declarations by Elizabeth George and an exhibit that included portions of Doherty's deposition. *See* Mot. to Strike, ECF No. 56 (Mot. to Strike). Rule 37(c) allows the Court to penalize a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e)," Fed. R. Civ. P. 37(c)(1). The party can avoid sanctions when any mistake is harmless. *See Smith v. Dist. of Columbia*, 319 F.R.D. 40, 47 (D.D.C. 2016).

Doherty argues that Turner should have provided George's sworn statements before filing its various motions. *See* Mot. to Strike at 2. Yet the discovery rules require disclosure of documents "already in existence." *Ascom Hasler Mailing Sys., Inc. v. USPS*, 267 F.R.D. 1, 8 (D.D.C. 2010) (cleaned up). As Turner points out, the George declarations did not exist until Turner filed its motions. *See* First George Decl.; Second Decl. of Lauren George, ECF No. 54-2 (dated on the same day as the filings to which turner attached the exhibits). That is enough to deny Doherty's motion.

Doherty also wants to strike excerpts of his deposition that Turner filed as an exhibit. *See* Def.'s MSJ, Ex. A. He says that Turner should have disclosed the deposition transcript before relying on it and that Turner has "cherry-picked sections" of his testimony. Mot. to Strike at 2. But Doherty had an equal chance to rely on the deposition and to file the portions he wanted.

9

Rule 30 requires a court reporter to furnish a deposition transcript "to any party or the deponent" when they pay "reasonable charges." Fed. R. Civ. P. 30(f)(3). Doherty could have paid for his own copy of that transcript—nothing required Turner to provide it ahead of time. In any event, Doherty has now filed the whole deposition. *See* Depo. The Court has reviewed it, so Doherty experiences no hardship from any error by Turner.

Lastly, Doherty asks the Court to strike Turner's "first and second set" of discovery responses because Turner gave them to Doherty after certain deadlines had passed. Mot. to Strike at 2. The Court will deny that request—Turner convincingly shows that Doherty either consented to those delays or caused them through his own unresponsiveness and clarifying questions. *See* Opp'n to Mot. to Strike at 14–15, ECF No. 57. And even if Turner missed deadlines, Doherty nowhere says that the delays impacted his ability to manage his case. Indeed, that he filed documents with the Court after these alleged deadlines and never raised Turner's tardiness suggests the opposite. So Turner's transgressions, if any, were harmless.

## V.

For these reasons, the Court will grant Turner's motion for summary judgment and deny Doherty's cross-motion. The Court will also deny Doherty's motion to strike. A separate Order will issue.[8]

Dated: April 15, 2022                                      TREVOR N. McFADDEN, U.S.D.J.

---

[8] The Court has considered Doherty's request for oral argument on his cross-motion, *see* Pl.'s MSJ at 1, n.2, but finds oral argument unnecessary here. *See* LCvR 78.1.